# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TERESA MARY PALMER, et al.,

        Plaintiffs,

vs.

SHAWNEE MISSION MEDICAL
CENTER, INC. and MID AMERICA
PHYSICIAN SERVICES, LLC,

        Defendants.

Case No. 16-2750-DDC-GLR

## MEMORANDUM AND ORDER

This case arises from an unexpected home birth that appears to have a happy ending. On November 5, 2014, a pregnant Teresa Mary Palmer awoke around 1:00 a.m. with cramps and pain. She called her OB/GYN to report the symptoms. Ms. Palmer's doctor told her that she had nothing to worry about but to call back if her pain increased. Around 2:00 a.m., Ms. Palmer's husband, mother, and father drove her to Shawnee Mission Medical Center ("SMMC"). SMMC admitted Ms. Palmer to its Birth Center, where non-physicians examined her and observed her for more than five hours. Eventually, SMMC diagnosed Ms. Palmer with false labor and, around 7:30 a.m., discharged her from the hospital.

Back at home, Ms. Palmer continued to experience painful cramps of longer duration and increased frequency. Her family called 911, and EMS personnel responded. With the assistance of EMS personnel, Ms. Palmer gave birth to her son at 9:14 a.m., on the floor of a bathroom in her home. Despite the unanticipated location of the birth, Ms. Palmer never alleges that she or her infant son sustained any physical injuries from the labor and delivery at home.

Based on these facts, Ms. Palmer, her husband, her mother, and her father bring this pro se[1] lawsuit against SMMC and Mid America Physician Services, LLC ("MAPS") asserting five claims for relief:  (1) violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, against SMMC; (2) strict liability against SMMC and MAPS; (3) res ipsa loquitur against SMMC and MAPS; (4) intentional tort liability against SMMC and MAPS; and (5) breach of contract against SMMC and MAPS.

This matter comes before the court on two motions to dismiss.  Docs. 51, 69.  Both SMMC and MAPS ask the court to dismiss the claims that plaintiffs assert against them under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim for relief.  For the reasons explained below, the court grants defendants' motions in part and denies them in part.

## I.    Motions to Strike

Before turning to the motions to dismiss, the court addresses two pending Motions to Strike.  Docs. 65, 76.  First, defendant SMMC moves to strike plaintiffs' Response to its Motion to Dismiss.  Doc. 65.  SMMC invokes Federal Rule of Civil Procedure 11(b)(1) and D. Kan. Rule 11.1, asserting that the court should strike plaintiffs' Response because plaintiffs filed it out of time and without leave of court upon a showing of excusable neglect.  Second, plaintiffs move to strike defendant SMMC's Reply to SMMC's Motion to Dismiss.  Doc. 76.  Plaintiffs invoke Federal Rule of Civil Procedure 12(f), asserting that the court should strike the portion of SMMC's Reply that responds to plaintiffs' accusation that SMMC falsified medical records.

The court begins with an observation about an increasing trend among litigants.  This trend consists of parties invoking these Rules in their motion practice, preferring to file motions to strike an opposing party's submission instead of simply filing a response or reply that

---

[1]    Because plaintiffs proceed pro se, the court construes their pleadings liberally.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that courts must construe pro se litigant's pleadings liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers).

addresses the improprieties or weaknesses of the opposing party's submission.  It is a perplexing trend.  This practice needlessly multiplies the motions that the court must rule, clogs the court's docket, and wastes judicial resources.  And, importantly, the Rules that the parties invoke here provide the court with no authority to strike the requested filings.

Rule 11(b)(1) provides that a party presenting a filing to the court certifies that the party is not presenting the filing "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  Fed. R. Civ. P. 11(b)(1).  A court may award sanctions under Rule 11(c) for a violation of subsection (b), but only "after notice and a reasonable opportunity to respond."  Fed. R. Civ. P. 11(c)(1).  A party also may move for sanctions under this Rule, but subsection (c)(2) requires the party to file a motion for sanctions "separately" and the rule includes a "safe harbor" provision.  This safety mechanism requires the moving party to serve the motion on the opposing party 21 days before filing it, thus giving the opposing party an opportunity to correct the issue.  Fed. R. Civ. P. 11(c)(2).  Here, SMMC has not filed a separate motion, and it provides no information showing that it has complied with Rule 11(c)(2)'s requirements.[2]  As our court has observed, the "failure to comply with these procedural requirements precludes an award of Rule 11 sanctions, and might even justify Rule 11 sanctions against [the moving party]."  *Berg v. Frobish*, No. 12-1123-KHV, 2015 WL 8966960, at *1 (D. Kan. Dec. 15, 2015).  The court denies SMMC's motion to strike for this reason.

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Our court has refused to apply Rule 12(f) to strike responses and replies to motions because this Rule

---

[2]    Indeed, SMMC filed its Motion to Strike on July 12, 2017—14 days after plaintiffs filed their Response.  Under these facts, SMMC could not have complied with the 21-day safe harbor requirement in Rule 11(c)(2).

applies only to "pleadings" and a response or a reply to a motion "is not a 'pleading' that the [c]ourt may strike under Rule 12(f)." *Fox v. Pittsburg State Univ.*, __ F. Supp. 3d __, 2017 WL 2735475, at *2 (D. Kan. June 26, 2017) (citing Fed. R. Civ. P. 7(a) (listing documents considered pleadings)); *see also Williams v. Alpine Banks of Colo.*, No. Civ. A. 05CV02475WDMME, 2006 WL 905333, at *2 (D. Colo. Apr. 7, 2006) (denying a motion to strike because "[m]otions, briefs in support of motions, responses to motions, replies to responses to motions, and other papers are not pleadings under the Federal Rules and cannot be stricken by the [c]ourt under Rule 12(f)"); *Watkins v. New Castle Cty.*, 374 F. Supp. 2d 379, 394 (D. Del. 2005) (denying a motion to strike because "Rule 12(f) applies only to pleadings, not motions and related documents."). Here, plaintiffs moved to strike part of defendant SMMC's Reply to its Motion to Dismiss. The Reply is not a pleading that the court may strike under Rule 12(f). The court thus denies plaintiffs' Motion to Strike for this reason.

Also, our court disfavors motions to strike. *Landrith v. Gariglietti*, No. 11-2465-KHV, 2012 WL 171339, at *1 (D. Kan. Jan. 19, 2012), *aff'd*, 505 F. App'x 701 (10th Cir. 2012); *Semsroth v. City of Wichita*, No. 06-2376-KHV-DJW, 2008 WL 45521, at *2 (D. Kan. Jan. 2, 2008); *Nwakpuda v. Falley's, Inc.*, 14 F. Supp. 2d 1213, 1215 (D. Kan. 1998). Courts usually deny motions to strike absent a showing of prejudice against the moving party. *Semsroth*, 2008 WL 45521, at *2. And, "any doubt [about] the utility of the material to be stricken should be resolved against the motion to strike." *Landrith*, 2012 WL 171339, at *1.

Even if the parties here had invoked the proper authority in their Motions to Strike, the court finds no reason to strike any of the requested filings. Defendant SMMC moves to strike plaintiffs' Response to SMMC's Motion to Dismiss because plaintiffs filed it <u>six</u> days late and without leave of court upon a showing of excusable neglect. Although the court does not

condone dilatory filing practices, SMMC fails to show that it sustained any prejudice from the late filing. These facts do not support striking plaintiffs' Response.

Plaintiffs' Motion to Strike seeks to strike a portion of SMMC's Reply to the Motion to Dismiss where SMMC asserts that plaintiffs improperly and falsely have accused SMMC of falsifying medical records. Plaintiffs' Motion never provides a reason for the court to strike the material from the record. Instead, plaintiffs merely dispute SMMC's denials that it falsified medical records. Plaintiffs assert that they have a valid basis to accuse SMMC of falsifying medical records. And, plaintiffs cite several attached exhibits—medical records and an investigation report—that, plaintiffs contend, support their accusations against SMMC. Plaintiffs' Motion demonstrates that the parties sharply disagree whether plaintiffs' accusations against SMMC are true. But, none of plaintiffs' arguments provide any reason for the court to strike SMMC's Reply.

The court thus denies defendant SMMC's Motion to Strike (Doc. 65) and plaintiffs' Motion to Strike (Doc. 76).

## II.     Motions to Dismiss

The court now turns to the two pending Motions to Dismiss.

### A.  Factual Background

The following facts are taken from plaintiffs' Second Amended Complaint (Doc. 23). The court accepts them as true and views them in the light most favorable to plaintiffs. *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). The court also construes plaintiffs' allegations liberally because they proceed pro se. *See Hall v. Bellmon*, 935 F.2d 1106, 1110

(10th Cir. 1991) (holding that courts must construe pro se litigant's pleadings liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers).

Around 1:00 a.m. on November 5, 2014, Teresa Mary Palmer awoke with cramps, pain, and a vaginal bloody discharge. She called the number on her OB/GYN's business card and spoke with a nurse who said a doctor would call her back. About five minutes later, a doctor returned the call and told her that she had "nothing to worry about," but advised her to go to the hospital if her pain increased.

Around 2:00 a.m., Gary Dean Grider (Ms. Palmer's husband), Teresa Marita Palmer (Ms. Palmer's mother), and James William Palmer (Ms. Palmer's father) drove Ms. Palmer to SMMC's Birth Center. At 2:32 a.m., SMMC admitted Ms. Palmer to the Labor Triage section for observation. Ms. Palmer complained of a new vaginal bloody discharge, abdominal cramps, and pain.

After Ms. Palmer's admission to the Birth Center, several different healthcare providers—none were physicians—examined her many times. These repeated examinations produced inconclusive results. Also, SMMC performed fetal monitoring on Ms. Palmer. The data from this monitoring was recorded on a 46-page chart. But, pages 26 to 31 were blank because the fetal monitor was not working properly. SMMC maintains an on-call, in-house, Board-certified, OB Hospitalist (a physician) who is available 24 hours a day to respond to obstetrical patients. SMMC never contacted this physician to provide treatment for Ms. Palmer.

SMMC observed Ms. Palmer for more than five hours. During this period of observation, Ms. Palmer demonstrated increasingly painful cramps. But, SMMC eventually diagnosed Ms. Palmer with false labor (Braxton Hicks contractions). And, at 7:38 a.m., SMMC discharged Ms. Palmer to her home. Although Ms. Palmer was able to walk without assistance

6

when SMMC admitted her, she required a wheelchair when SMMC discharged her because she was in so much pain.  While sitting in the wheelchair, Ms. Palmer experienced a particularly painful cramp in front of several providers and medical staff.  Ms. Palmer had to stand up and bend over to endure the pain this cramp caused her.

After Ms. Palmer returned home, she continued to experience increasingly painful cramps of longer duration and increased frequency.  Ms. Palmer followed her discharge instructions, took a Tylenol, and tried to sleep.  She also tried to relax in a warm bath but painful cramps gave her an uncontrollable urge to scream and pound the wall with her fist.

The family eventually called 911, and EMS personnel responded.  When an EMS technician entered the house, he heard Ms. Palmer's screams coming from a bathroom on the other side of the house.  The EMS technician said, "That's not Braxton Hicks."  EMS personnel connected a fetal monitoring device to Ms. Palmer and examined her on the bathroom floor. Based on the examination, EMS personnel told the family that they would have to deliver the baby in the bathroom.  At 9:14 a.m., Ms. Palmer delivered a baby boy at her home.  This happened one hour and 36 minutes after SMMC had discharged Ms. Palmer from its Birth Center.

EMS personnel transported Ms. Palmer and her baby boy to SMMC's Birth Center by ambulance.  SMMC admitted Ms. Palmer and the baby for evaluation and care.  The Second Amended Complaint never alleges that this evaluation revealed that Ms. Palmer or her baby sustained any physical injuries from the home birth.  Instead, it alleges that "[t]he misdiagnosis of Braxton Hicks contractions (aka False Labor) led to consequences, that once started, triggered a cascade of irreversible, dangerous events, leading to the painful, unplanned home-birth without the benefits of a physician's assistance or any pain medication."  Doc. 23 at 6 (Compl. ¶ 39).  It

also alleges that SMMC's discharge of Ms. Palmer has caused her and her family to experience "severe emotional distress." *Id.* at 8, 11, 13, 16, 19 (Compl. ¶¶ 45, 56, 66, 78, 92).

A few days after the birth, Ms. Palmer's father (James William Palmer) contacted the Kansas Department of Health and Environment ("KDHE") to complain about the treatment his daughter received at SMMC's Birth Center. KDHE referred the complaint to the responsible federal agency—Centers for Medicare & Medicaid Services ("CMS"). As federal law requires, CMS investigated the complaint and conducted an unannounced on-site inspection of SMMC's hospital facilities within 15 days of the complaint's referral to the agency. The investigation determined that SMMC twice had violated EMTALA (42 U.S.C. §1395dd). CMS issued a Statement of Deficiencies identifying those violations of federal law. CMS also cited SMMC for failing to provide Ms. Palmer with a proper Medical Screening Examination and improperly discharging her as an unstable patient.

### B.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'" *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

While the court must assume that the factual allegations in the complaint are true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1263 (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

### C. Analysis

Defendants SMMC and MAPs move to dismiss all five claims that plaintiffs assert against them. The court discusses each claim, separately, in the following sections.

### 1. EMTALA Claim

Plaintiffs assert a claim against defendant SMMC for violating EMTALA. EMTALA is a federal statute that provides for civil penalties for hospitals and physicians who negligently violate the Act. 42 U.S.C. § 1395dd(d)(1). "Congress enacted EMTALA in 1986 to address the problem of 'dumping' patients in need of medical care but without health insurance." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001) (first citing *Abercrombie v. Osteopathic Hosp. Founders Ass'n*, 950 F.2d 676, 680 (10th Cir. 1991); then citing *Stevison v. Enid Health Sys.*, 920 F.2d 710, 713 (10th Cir. 1990)). EMTALA requires a participating hospital to comply with two requirements. *Id.* "First, the hospital must conduct an initial medical examination to determine whether the patient is suffering from an emergency medical condition." *Id.*; *see also*

42 U.S.C. § 1395dd(a) ("[T]he hospital must provide for an appropriate medical screening . . . to determine whether or not an emergency medical condition . . . exists."). "The second obligation requires the hospital, if an emergency medical condition exists, to stabilize the patient before transporting him or her elsewhere." *Phillips*, 244 F.3d at 796; *see also* 42 U.S.C. § 1395dd(b) ("If . . . the hospital determines that the individual has an emergency medical condition, the hospital must provide either . . . such further medical examination and such treatment as may be required to stabilize the medical condition, or . . . transfer . . . the individual to another medical facility [after satisfying certain requirements in] subsection (c) of this section."). "To ensure compliance with these obligations, Congress created a private cause of action." *Phillips*, 244 F.3d at 796 (first citing 42 U.S.C. § 1395dd(d); then citing *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 521–22 (10th Cir. 1994)).

The Tenth Circuit has cautioned, however, that EMTALA "is neither a malpractice nor a negligence statute." *Repp*, 43 F.3d at 522 (citation and internal quotation marks omitted). When Congress enacted EMTALA, it never "intended 'to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances.'" *Id.* (quoting *Collins v. DePaul Hosp.*, 963 F.2d 303, 307 (10th Cir. 1992)). So, to state a viable EMTALA claim, a plaintiff must allege that the treating hospital treated him or her differently than it would treat other patients in like circumstances. *Id.* ("A hospital satisfies the requirements of § 1395dd(a) if its standard screening procedure is applied uniformly to all patients in similar medical circumstances." (citation and internal quotation marks omitted)); *see also id.* ("[A] hospital violates [EMTALA] when it does not follow its own standard procedures."); *see also Phillips*, 244 F.3d at 796–97

("A court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed." (citation and internal quotation marks omitted)).

Here, the Complaint alleges that SMMC provided Ms. Palmer "an inappropriate, disparate medical screening examination" that violated SMMC's "established hospital policy, federal anti-discrimination and state law, and [was] unlike the exams provided other similarly situated patients." Doc. 23 at 7 (Compl. ¶ 40). Also, it alleges that SMMC discharged Ms. Palmer "in violation of established hospital policy, EMTALA and other federal and state law, and acceptable medical standards that require patients experiencing over five hours of increasingly painful cramps of longer duration and occurring more frequently, not be discharged until after the birth is completed and the patient stable." *Id.* (Compl. ¶ 41).

The Complaint alleges that SMMC failed to stabilize Ms. Palmer before discharging her, failed to provide a more qualified and trained medical provider to resolve the discrepancies revealed in Ms. Palmer's many examinations, and never notified the proper authorities of a suspected EMTALA violation within 72 hours as EMTALA requires. *Id.* (Compl. ¶¶ 42, 43, 44). And, it alleges that CMS concluded that SMMC twice violated EMTALA. *Id.* at 6 (Compl. ¶ 35). Plaintiffs assert that CMS cited SMMC for failing to provide Ms. Palmer a proper Medical Screening Examination and improperly discharging Ms. Palmer as an unstable patient. *Id.* (Compl. ¶ 36).

The court recognizes that these allegations are just that—allegations that SMMC violated EMTALA. Ultimately, to prevail on an EMTALA claim, a plaintiff must come forward with properly admissible evidence capable of supporting the findings required for an EMTALA violation. But, on a motion to dismiss, the court must accept the Complaint's allegations as true and view them in the light most favor to plaintiffs. Applying that standard, the court finds the

Complaint's allegations sufficient to withstand defendant SMMC's Motion to Dismiss the
EMTALA claim asserted by plaintiff Teresa Mary Palmer.

SMMC disagrees. It contends that plaintiffs' allegations, even if accepted as true, could
support no more than a *de minimus* variation from SMMC's standard screening procedures.
And, the Tenth Circuit has held that *de minimus* violations are insufficient to impose liability
under EMTALA. *Repp*, 43 F.3d at 523. While SMMC has portrayed *Repp* faithfully, the facts at
issue in *Repp* differ significantly from the facts alleged here. *Repp* affirmed summary judgment
against a plaintiff's EMTALA claim, concluding that the summary judgment record showed
"minimal variations from the hospital's emergency room policy [that] did not amount to a
violation of the hospital's standard screening procedures." *Id.* In contrast here, the court is not
considering whether plaintiffs have established an EMTALA claim sufficient to survive
summary judgment. Instead, the court looks only to the Complaint's allegations which—as
pleaded—assert more than *de minimus* violations of hospital policy. Plaintiffs assert that SMMC
provided Ms. Palmer disparate medical treatment that violated hospital policy, including
allegations that SMMC failed to have more qualified and trained medical providers examine her
and resolve the discrepancies in her other evaluations. Accepting these allegations as true and
viewing them in plaintiffs' favor, the court concludes that plaintiff Teresa Mary Palmer has
asserted facts sufficient to state a plausible claim against SMMC under EMTALA. So the court
denies SMMC's motion as it applies to Ms. Palmer's claim.

But, in contrast, the court concludes that the other three defendants lack standing to assert
an EMTALA claim based on the treatment SMMC provided to Ms. Palmer. EMTALA provides
that "[a]ny individual who suffers personal harm as a direct result of a participating hospital's
violation of a requirement of this section may, in a civil action against the participating hospital,

obtain those damages available for personal injury under the law of the State in which the

hospital is located[.]" 42 U.S.C. § 1395dd(d)(2).  Several district courts have interpreted the

statute's use of the term "any individual" as conferring standing only on a patient and not a

patient's family members asserting personal claims for emotional damages, derived from the

alleged EMTALA violation.  *See*, *e.g.*, *Pujol-Alvarez v. Grupo HIMA-San Pablo, Inc.*, 249 F.

Supp. 3d 591, 595 (D.P.R. 2017) (holding that surviving family members lacked standing to

bring EMTALA claim to recover emotional distress damages based on defendants' alleged delay

in providing medical treatment to the decedent); *Mixon v. Bronson Health Care Grp., Inc.*, No.

1:14-cv-330, 2015 WL 1478020, at *4 (W.D. Mich. Mar. 31, 2015) (holding that a mother

lacked standing to bring an EMTALA claim based on emotional distress damages she sustained

from the loss of her son); *Pauly v. Stanford Hosp.*, No. 10-cv-5582-JF(PSG), 2011 WL 1793387,

*4 (N.D. Cal. May 11, 2011) (holding that a mother lacked standing to bring an EMTALA claim

based on treatment her daughter received and noting the policy concerns of reaching a contrary

conclusion:  "Extending a private right of action to a third party when the individual patient is

still living would result in a significant expansion of liability for hospitals subject to EMTALA's

provisions.").

  Plaintiffs assert that the Sixth Circuit extended EMTALA's coverage to non-patients in

*Moses v. Providence Hospital & Medical Centers, Inc.*, 561 F.3d 573 (6th Cir. 2009).  But, the

facts of *Moses* differ significantly from the facts here.  In *Moses*, the plaintiff brought an

EMTALA claim against a hospital as the representative of Marie Moses-Irons' estate.  *Id.* at 575.

Ms. Moses-Irons had taken her husband to the defendant's hospital because he was experiencing

signs of illness including severe headaches, vomiting, slurred speech, disorientation,

hallucinations, and delusions.  *Id.* at 576.  The hospital admitted the husband and examined him

several times during a seven-day stay.  *Id.*  But, the hospital never ordered psychiatric treatment for the husband and eventually discharged him to his home.  *Id.* at 576–77.  Ten days after discharge, the husband murdered Ms. Moses-Irons.  *Id.* at 577.

On summary judgment, the hospital argued that the plaintiff lacked standing to sue under EMTALA, but the district court never addressed this issue.  *Id.* 577–78.  The Sixth Circuit considered the standing issue on appeal, however, recognizing that EMTALA's statutory language never mentions claims by non-patients.  *Id.* at 580.  The Circuit also noted that no other federal appellate court had addressed third-party standing under EMTALA.  *Id.*  But, the Sixth Circuit reasoned that "the estate of the individual who suffered *an actual personal injury* brings the suit in this case, claiming personal harm as a direct result of the hospital's decision."  *Id.* (emphasis added). The Circuit also found that the plain language of the statute "would seem to include Plaintiff, whose suit alleges that Moses-Irons' death was the direct result of the hospital's decision to release her husband before his psychiatric emergency medical condition had stabilized."  *Id.*

*Moses* differs from this case in many important respects.  Most significantly, it involved a plaintiff bringing a lawsuit under EMTALA as the representative of someone whose death allegedly resulted from the defendant hospital's EMTALA violation.  Plaintiffs here allege no similar facts.  Indeed, other courts have declined to follow *Moses* because it presents a distinct fact pattern that differs from cases—like this one—where the family members of a still-living patient allege an EMTALA violation based on their own emotional distress.  *See*, *e.g.*, *Mixon*, 2015 WL 1478020, at *4 (explaining that because "*Moses* involved 'actual personal injury' (*i.e.*, death) to plaintiff's decedent, courts in the Sixth Circuit have subsequently distinguished EMTALA claims, as is the case here, where no such injuries are alleged"); *Pauly*, 2011 WL

1793387, *5 (finding that *Moses* was limited to the unique facts of the case and following the more persuasive authority of district court cases holding that non-patient family members lack standing to sue under EMTALA). The court finds that this case presents facts similar to those in *Mixon* and *Pauly* and ones unlike *Moses.* Ms. Palmer's family members assert an EMTALA claim based on alleged emotional distress they sustained from SMMC's treatment of their wife and daughter. District courts repeatedly have held that non-patient family members lack standing to assert such claims under EMTALA. The court thus dismisses the EMTALA claims asserted by Gary Dean Grider (Ms. Palmer's husband), Teresa Marita Palmer (Ms. Palmer's mother), and James William Palmer (Ms. Palmer's father).

## 2. Strict Liability

Next, defendants SMMC and MAPS[3] move to dismiss plaintiffs' strict liability claim. Plaintiffs' Complaint asserts that, when defendants discharged plaintiff Teresa Mary Palmer from the hospital, their actions "amount[ ] to actionable negligence that rises to the level of an abnormally dangerous activity" and "renders [defendants] in violation of the Kansas Common Law doctrine of Strict Liability." Doc. 23 at 9–10 (Compl. ¶ 52).

In Kansas, strict liability "means liability imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care (i.e., actionable negligence)." *Williams v. Amoco Prod. Co.*, 734 P.2d 1113, 1121 (Kan. 1987) (citing Prosser and Keeton on Torts § 75, p. 534

---

[3]    Plaintiffs assert that defendant MAPS' Motion to Dismiss is untimely. The court disagrees. On March 30, 2017, Judge Rushfelt entered a Scheduling Order (Doc. 30) that required the parties to file motions to dismiss by June 1, 2017. Doc. 30 at 2, 8. On June 1, 2017, MAPS filed a Motion for Extension of Time to File Motions to Dismiss. Doc. 50. Judge Rushfelt granted that motion and ordered defendant MAPS to file any motion to dismiss within 14 days of either (a) the court's denial of plaintiffs' motion for leave to amend to file a Third Amended Complaint, or (b) if the motion is granted, plaintiffs filing of the Third Amended Complaint. Doc. 63. On July 12, 2017, Judge Rushfelt denied plaintiffs' Motion for Leave to File a Third Amended Complaint. Doc. 64. Fourteen days later, MAPS timely filed its Motion to Dismiss. Doc. 69.

(5th ed. 1984)).  In *Williams*, the Kansas Supreme Court adopted § 519 and § 520 of the

Restatement (Second) of Torts (1976).  *Id.*  It held:

> The general rule imposing strict liability in tort for abnormally dangerous activities as set forth in the Restatement (Second) of Torts § 519 (1976) is stated and adopted:  (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm; and (2) this strict liability is limited to the kind of harm the possibility of which makes the activity abnormally dangerous.
>
> In determining whether an activity is abnormally dangerous, the following factors are to be considered:  (a) Existence of a high degree of risk of some harm to the person, land, or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes. Restatement (Second) of Torts § 520 (1976).

*Id.* at 1115–16, Syl. ¶¶ 8, 9.  Applying the Restatement, *Williams* concluded that "the drilling and

operation of natural gas wells is not an abnormally dangerous activity in relation to the type of

harm sustained by [the plaintiffs]."  *Id.* at 1123.

Our court has observed that "Kansas courts have traditionally defined 'abnormally

dangerous activities' very narrowly."  *Anderson v. Farmland Indus., Inc.*, 136 F. Supp. 2d 1192,

1201 (D. Kan. 2001) (Lungstrum, J.) (first citing *Williams*, 734 P.2d at 1123 (drilling and

operation of natural gas well was not abnormally dangerous activity for purposes of determining

whether to impose strict liability on gas company); then citing *Balagna v. Shawnee Cty.*, 668

P.2d 157, 168 (Kan. 1983) (trenching work was not an inherently dangerous activity); then citing

*John T. Arnold Assocs. Inc. v. City of Wichita*, 615 P.2d 814, 826 (Kan. Ct. App. 1980) (city's

maintenance of water main was not an abnormally dangerous activity) (further citation omitted)).

Here, plaintiffs cite no Kansas cases holding that a medical provider engages in an

abnormally dangerous activity by providing medical services.  And, the court's own research has

16

revealed no such authority in Kansas. Plaintiffs also never discuss any of the factors recited in §

520 of the Restatement (Second) of Torts as ones a court must consider when determining

whether an activity is an abnormally dangerous one. After considering those factors here, the

court concludes that none support the conclusion that providing medical care is an "abnormally

dangerous activity" in Kansas. Plaintiffs' Complaint thus fails to state a claim for strict liability

under Kansas law.

### 3.   Res Ipsa Loquitur

Next, defendants SMMC and MAPS ask the court to dismiss plaintiffs' res ipsa loquitur

claim. Res ipsa loquitur means "the thing speaks for itself." *Emigh v. Andrews*, 191 P.2d 901,

903 (Kan. 1948). Res ipsa loquitur applies in negligence cases "when the initial fact, namely

what thing or instrumentality caused the accident has been shown then, and not before, an

inference arises that the injury or damage occurred by reason of the negligence of the party who

had it under his exclusive control." *Id.* Then, "[t]he inference of negligence arising from the

initially established fact compels the defendant, in order to relieve himself of liability, to move

forward with his proof to rebut the inference of negligence." *Id.* The Kansas Supreme Court

thus has concluded that "the doctrine of res ipsa loquitur is a rule of evidence and not of

substantive law." *Id.*; *see also Bias v. Montgomery Elevator Co.*, 532 P.2d 1053, 1055 (Kan.

1975) ("The doctrine of res ipsa loquitur . . . is intended to operate solely as a rule of evidence

rather than as substantive law.").

The Kansas Supreme Court applies "the doctrine of res ipsa loquitur . . . in a medical

malpractice action only where a layman is able to say as a matter of common knowledge and

observation, or from the evidence can draw an inference, that the consequences of professional

treatment were not such as ordinarily would have followed if due care had been exercised."

*Funke v. Fieldman*, 512 P.2d 539, 550 (Kan. 1973); *see also Frans v. Gausman*, 6 P.3d 432, 439 (Kan. Ct. App. 2000) ("[R]es ipsa doctrine is seldom applicable in actions for damages by patients against physicians.").  Following this standard, the Kansas Supreme Court has refused to apply res ipsa loquitur when a medical procedure is "so complicated as to lie beyond the realm of common knowledge and experience of laymen as to whether such result would not ordinarily occur in the absence of negligence." *Funke*, 512 P.2d at 550 (citing *Tatro v. Lueken*, 512 P.2d 529, 536 (Kan. 1973)); *see also Frans*, 6 P.3d at 439 (refusing to apply res ipsa loquitur where "the identity of the cause of the injury was hotly contested").

Even if plaintiffs could assert a separate claim for res ipsa loquitur, plaintiffs cite no Kansas cases holding that a lay person possesses common knowledge and experience to know whether defendants negligently provided medical care to Ms. Palmer when she presented to SMMC's Birth Center with symptoms of pain, cramping, and discharge.  This type of determination typically requires expert testimony.  And, as shown from the parties' submissions, the issue whether defendants provided Ms. Palmer with adequate medical care is a "hotly contested" one.  *Frans*, 6 P.3d at 439.  The court thus concludes that plaintiffs' Complaint fails to allege facts sufficient to support applying the doctrine of res ipsa loquitur.  The court thus dismisses plaintiffs' res ipsa loquitur claim.

### 4.  Intentional Tort Liability

Defendants next ask the court to dismiss plaintiffs' claim for "intentional tort liability." Doc. 23 at 14.  Plaintiffs' Complaint never explains—at least not clearly—what intentional tort they allege defendants committed.  In one paragraph, plaintiffs allege that defendants committed "six instances of medical battery . . . in violation of the Kansas Common Law doctrine of Intentional Torts."  Doc. 23 at 15 (Compl. ¶ 71).  In another paragraph, plaintiffs allege that

defendants' conduct "was outrageous" and that they "acted with an evil motive and/or reckless indifference to the rights of Plaintiffs." *Id.* at 17 (Compl. ¶ 79).

To the extent plaintiffs assert a battery claim, the Complaint fails to allege facts sufficient to support a battery claim under Kansas law. In Kansas, "[b]attery is defined as 'the unprivileged touching or striking of one person by another, done with *the intent* of bringing about either a contact or an apprehension of contact, that is harmful or offensive.'" *Baska v. Scherzer*, 156 P.3d 617, 622 (Kan. 2007) (quoting PIK Civ. 3d 127.02 (further citation omitted)) (emphasis added). A battery claim is "grounded upon the actor's intention to inflict injury." *Id.* (citation omitted). Here, plaintiffs allege no facts capable of supporting a plausible finding or inference that defendants *intentionally* inflicted injury on Ms. Palmer. To the contrary, the Complaint repeatedly alleges that defendants acted negligently. *See*, *e.g.*, Doc. 23 at 3 (Compl. ¶ 12 (alleging that defendants "negligently and carelessly provided care and treatment to Plaintiff Teresa Mary Palmer")). The Complaint thus fails to allege a battery claim under Kansas law.

To the extent plaintiffs aspire to assert a claim for intentional infliction of emotional distress under Kansas law, it's a close question whether the Complaint alleges facts supporting a plausible claim for relief. "Kansas has set a very high standard for the common law tort of intentional infliction of emotional distress or, as it is sometimes referred to, the tort of outrage." *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1304 (D. Kan. 2009) (citation and internal quotation marks omitted); *see also McCall v. Bd. of Comm'rs of Cty. of Shawnee, Kan.*, 291 F. Supp. 2d 1216, 1229 (D. Kan. 2003) ("Claims of outrage in Kansas are reserved for the most egregious circumstances."). Indeed, "[t]he overwhelming majority of Kansas cases have held in favor of defendants on the outrage issue, finding that the alleged conduct was

insufficiently 'outrageous' to support the cause of action." *Lindemuth v. Goodyear Tire & Rubber Co.*, 864 P.2d 744, 749 (Kan. Ct. App. 1993).

In Kansas, intentional infliction of emotional distress requires the following four elements:

> (1) The conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe.

*Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010) (citing *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991)). Here, the Complaint alleges that defendants acted with "reckless indifference" and engaged in "outrageous" conduct that caused plaintiffs to sustain "severe emotional distress." Doc. 23 at 16–17 (Compl. ¶¶ 78, 79). Plaintiffs thus have pleaded the elements of an intentional infliction of emotional distress claim under Kansas law. Whether the facts alleged actually rise to the level of "extreme and outrageous" conduct or produced "extreme and severe" mental distress sufficient to support an intentional infliction claim under Kansas law is a harder question. At this stage of the litigation, however, the court concludes that plaintiffs have pleaded sufficient facts to deserve an opportunity to discover additional facts to support their allegations. Whether discovery will reveal facts sufficient to support the "very high standard for the common law tort of intentional infliction of emotional distress" remains a question for another day. *The Farm, Inc.*, 658 F. Supp. 2d at 1304. But, for now, the court concludes that plaintiffs have alleged facts sufficient to "nudge[ ]" an intentional infliction of emotional distress claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Defendants argue that Kansas law prohibits "recovery for emotional distress suffered by the plaintiff which is caused by the negligence of the defendant unless it is accompanied by or results in physical injury to the plaintiff." *Hoard v. Shawnee Mission Med. Ctr.*, 662 P.2d 1214, 1219–20 (Kan. 1983). "This rule, however, does not apply where the injurious conduct is willful or wanton, or the defendant acts with intent to injure." *Id.* at 1220. As noted, plaintiffs have alleged that defendants acted with reckless indifference. The court thus concludes these allegations are sufficient to preclude application of the rule announced by *Hoard*. *See Gould v. Taco Bell*, 722 P.2d 511, 518 (Kan. 1986) (defining "a 'wanton act' as something more than ordinary negligence but less than a willful act. It must indicate a realization of the imminence of danger and a reckless disregard and indifference to the consequences.").

The court finds that plaintiffs have alleged facts sufficient to state a claim for intentional infliction of emotional distress under Kansas law.

### 5. Breach of Contract

Plaintiffs' Complaint labels this last claim as one for "contract liability." Doc. 23 at 17. The court construes this claim as one asserting breach of contract against defendants SMMC and MAPS. Defendants move to dismiss this claim because they allege that plaintiffs' claims sound in tort, not contract.

Plaintiffs' Responses to defendants' Motions to Dismiss never respond to the arguments supporting dismissal of the contract claim. Docs. 60, 72. Indeed, neither Response ever even mentions the contract claim. The court thus concludes that plaintiffs have abandoned their contract claim. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's dismissal of plaintiff's equal protection claim after it concluded that

plaintiff had abandoned the claim because he had not addressed it in his memorandum opposing summary judgment).

And, even if not abandoned, plaintiffs' Complaint fails to state a breach of contract claim as a matter of law because it never alleges the essential elements of the claim under Kansas law. *See Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (listing the elements of a breach of contract claim under Kansas law as: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach.").

### III.    Conclusion

For the reasons explained, the court denies defendant SMMC's Motion to Dismiss plaintiff Teresa Mary Palmer's EMTALA claim. The court also denies defendants' Motions to Dismiss plaintiffs' intentional infliction of emotional distress claim. The court grants defendants' Motions to Dismiss in all other respects.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Shawnee Mission Medical Center's Motion to Dismiss (Doc. 51) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendant Mid America Physician Services, LLC's Motion to Dismiss (Doc. 69) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendant Shawnee Mission Medical Center's Motion to Strike (Doc. 65) is denied.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion to Strike (Doc. 76) is denied.

**IT IS SO ORDERED.**

Dated this 21st day of November, 2017, at Topeka, Kansas.

                                        s/ Daniel D. Crabtree
                                        Daniel D. Crabtree
                                        United States District Judge