## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TERESA MARY PALMER, et al.,

      Plaintiffs,

vs.

SHAWNEE MISSION MEDICAL
CENTER, INC. and MID AMERICA
PHYSICIAN SERVICES, LLC,

      Defendants.

Case No. 16-2750-DDC-GLR

## MEMORANDUM AND ORDER

On November 5, 2014, plaintiff Teresa Mary Palmer gave birth to a son. Several hours before the baby's birth, Ms. Palmer began experiencing cramps and pain. So her husband, mother, and father drove her to Shawnee Mission Medical Center ("SMMC"). SMMC admitted Ms. Palmer to its Birth Center, but later diagnosed her with false labor and discharged her from the hospital. Ms. Palmer returned home, and she continued to experience cramps and pain. Eventually, her family called 911, and EMS responded to her home. Shortly thereafter, EMS assisted Ms. Palmer as she gave birth to her son on the floor of the bathroom in her home. Neither Ms. Palmer nor her son sustained any physical injuries from the home birth. To the contrary, Ms. Palmer testified that her son is "normal and healthy." Doc. 142-9 at 20–21 (Teresa Mary Palmer Dep. 76:21–77:5).

This lawsuit arises from Ms. Palmer's unanticipated home birth. Ms. Palmer, her husband, her mother, and her father, all proceeding pro se,[1] assert two claims against defendants

---

[1]     Because plaintiffs proceed pro se, the court construes their pleadings liberally. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that courts must construe pro se litigant's pleadings liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers).

SMMC and Mid America Physician Services, LLC. Ms. Palmer asserts a claim against SMMC for violating the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. And all four plaintiffs assert a Kansas state law claim for intentional infliction of emotional distress against both SMMC and MAPS.

This matter comes before the court on the parties' cross motions for summary judgment. Defendants SMMC and MAPS have filed separate Motions for Summary Judgment. Docs. 133, 141. Defendants' motions ask the court to grant summary judgment against each of plaintiffs' claims. Also, plaintiffs have filed a Motion for Summary Judgment. Doc. 145. Plaintiffs ask the court to grant summary judgment in their favor on each claim they assert against defendants in this lawsuit.

After considering the parties' arguments, the court grants defendants' Motions for Summary Judgment and denies plaintiffs' Motion for Summary Judgment. The court explains why below.

## I.  Admissible Summary Judgment Evidence

Before turning to the parties' summary judgment motions, the court addresses what evidence it can consider on these motions. Specifically, the parties dispute whether the court can consider two pieces of evidence that plaintiffs rely on both to support their Motion for Summary Judgment and to controvert defendants' facts supporting their Motions for Summary Judgment. The two pieces of evidence are: (1) a report prepared by the Centers for Medicare & Medicaid Services ("CMS") (Doc. 145-1), as well as other documents referring to Ms. Palmer's complaint to CMS (*see, e.g.*, Docs. 145-3, 145-18, 145-20) (collectively "CMS documents"); and (2) a

---

But the court does not assume the role of advocate for pro se litigants by constructing arguments or searching the record. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

revised version of SMMC's Patient Care Protocol No. 308, a revision that SMMC issued after November 5, 2014 (Docs. 145-5, 145-24).

For the court to consider this evidence on summary judgment, plaintiffs must establish that the content and substance of the evidence is admissible. *See Johnson v. Weld Cty.*, 594 F.3d 1202, 1209 (10th Cir. 2010) (explaining that it is "well settled in this circuit" that, at summary judgment, courts can consider only admissible evidence); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact [on summary judgment] cannot be presented in a form that would be admissible in evidence."). For reasons explained below, the court concludes that both items of evidence are, in present form, inadmissible, and thus the court may not consider either one to decide the summary judgment motions.

### A. CMS Documents

Plaintiffs ask the court to take judicial notice of the CMS documents under Fed. R. Evid. 201(b)(2). Doc. 149-29. Fed. R. Evid. 201(b)(2) allows a court to take judicial notice of a fact not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The court declines to take judicial notice of the CMS documents under this rule because, as defendants correctly argue, plaintiffs have not authenticated the documents and they contain many hearsay statements. Thus, the CMS documents are not "from sources whose accuracy cannot reasonably be questioned," as Fed. R. Evid. 201(b)(2) requires. *See United States v. Burch*, 169 F.3d 666, 672 (10th Cir. 1999) (refusing to take judicial notice of facts from photocopy of a map and hearsay affidavit because these were not sources "whose accuracy cannot reasonably be questioned" as Fed. R. Evid. 201(b)(2) requires).

Although not cited by plaintiffs, the court has considered whether the hearsay exception for public records found in Fed. R. Evid. 803(8) makes the CMS documents admissible. Plaintiffs have not made any showing that the CMS documents qualify as a public record under this Rule. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (holding that a letter was inadmissible evidence at trial because it was hearsay and the party offering the letter failed to identify any applicable hearsay exception); *see also Woodhull v. Cty. of Kent*, No. 1:04-cv-203, 2006 WL 2228986, at *5 n.4 (W.D. Mich. Aug. 3, 2006) (refusing to consider an investigative report on summary judgment because the party offering the report never "provided foundational facts establishing that the [report] falls within Fed. R. Evid. 803(8), which provides a hearsay exception for certain 'public' records and reports").

And, even if plaintiffs had asserted that the CMS documents qualify as a public record under Rule 803(8)'s hearsay exception, plaintiffs have not authenticated the CMS documents properly. Although Fed. R. Evid. 902 allows for self-authentication of public records, the CMS documents are not self-authenticating because they contain neither seal (as Fed. R. Evid. 902(1) requires) nor a certification (as Fed. R. Evid. 902(2) and 902(4) require). And plaintiffs don't authenticate the CMS documents using any of the other means in Fed. R. Evid. 901. Thus, the court cannot consider the CMS documents on summary judgment because they are not authenticated. *See United States v. Baker*, 538 F.3d 324, 331 (5th Cir. 2008) (explaining that "[r]egardless of whether [the evidence] falls within the ambit of [Fed. R. Evid.] 803(8) . . . [the party offering the evidence] did not authenticate [it], which is necessary as a predicate for admission under" Fed. R. Evid. 803(8)); *see also United States v. 478.34 Acres of Land*, 578 F.2d 156, 159 (6th Cir. 1978) (holding that a Corp of Engineers statistical survey was inadmissible evidence because no "effort [was] made to verify or authenticate the data in

accordance with Rule 901," and the evidence thus "did not come within the exception to the hearsay rule admitting deeds and public records, Rule 803(8), (14), (15), or any other exception to the hearsay rule"); *In re Marshall Complex Fire*, No. CV-09-0010-RMP, 2010 WL 1416843, at *4 (E.D. Wash. Apr. 8, 2010) (concluding that a state agency's report was inadmissible on summary judgment because the report was not authenticated under either Fed. R. Evid. 901 or 902, and thus did "not satisfy the threshold requirement of authentication" for the court to consider whether it fell within the hearsay exception of Fed. R. Evid. 803(8)).

Also, to the extent plaintiffs ask the court to accept any legal conclusion the CMS documents may contain, the court cannot consider that kind of evidence on summary judgment. *See Sprint Commc'ns Co. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007) (explaining that legal conclusions are not "facts as would be admissible in evidence" as Fed. R. Civ. P. 56 requires (citations and internal quotation marks omitted)); *see also Shelter Mortg. Corp. v. Castle Mortg. Co., L.C.*, 117 F. App'x 6, 10 (10th Cir. 2004) (holding that the district court "correctly struck inadmissible hearsay and inadmissible legal conclusions" on summary judgment).

For all these reasons, the court rules that it may not consider the CMS documents to decide the current summary judgment motions because they are not admissible under the Federal Rules of Evidence.

### B.  Revised Version of Patient Care Protocol No. 308

Also, the court can't consider the revised version of SMMC's Patient Care Protocol No. 308.  SMMC issued the revised version of this policy after November 5, 2014.  Thus, the revised policy was not in effect when Ms. Palmer presented to SMMC's Birth Center on November 5, 2014.  Defendant SMMC argues that this evidence is inadmissible under Fed. R. Evid. 407

because it qualifies as a subsequent remedial measure. Plaintiffs never responded to this argument.

Fed. R. Evid. 407 provides that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct . . . ." The Tenth Circuit has recognized "two primary grounds for the exclusion of evidence under Rule 407: (1) the limited probative value of subsequent remedial measures; and (2) '[the] social policy of encouraging people to take . . . steps in furtherance of added safety.'" *Stahl v. Bd. of Cty. Comm'rs*, 101 F. App'x 316, 321 (10th Cir 2004) (quoting *Hull v. Chevron, U.S.A.*, 812 F.2d 584, 587 (10th Cir. 1987)). Thus, under Rule 407, "courts have excluded 'repairs, changes in construction, installation of new safety devices . . . , *changes in rules and regulations*, [and] changes in the practice of the business.'" *Id.* (quoting 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5284 (2d ed. 1980)) (emphasis added).

Here, plaintiffs offer the revised version of Patient Care Protocol No. 308 as evidence to support their claims against defendant SMMC. Thus, plaintiffs seek to use the revised policy—a subsequent measure taken by SMMC—to prove culpable conduct. Fed. R. Evid. 407 prohibits admitting evidence for that purpose. And plaintiffs offer no other purpose that would allow the court to consider this evidence on summary judgment. *See* Fed. R. Evid. 407 (providing exceptions for the court to "admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures"). The court concludes that the revised version of Patient Care Protocol No. 308 is inadmissible evidence under Fed. R. Evid. 407. Consequently, the court does not consider the revised policy when deciding the parties' summary judgment motions.

## II.     Uncontroverted Facts

The following facts are uncontroverted for purposes of the parties' summary judgment motions.

On November 5, 2014, plaintiff Teresa Mary Palmer was 36.2 weeks pregnant.  At 2:26 a.m., she presented to SMMC's Birth Center, complaining that she was cramping, experiencing vaginal bleeding, and discharging pinkish fluid.  Before coming to SMMC's Birth Center, Ms. Palmer[2] was receiving prenatal care from Dr. Angela Piquard.  SMMC staff admitted Ms. Palmer for observation and assessment under Dr. Piquard's name.

In November 2014, SMMC had a policy titled Patient Care Protocol No. 308 (Medical Screening Exam (MSE), Care of the Perinatal Patient Receiving).  Patient Care Protocol No. 308 applied to pregnant patients who presented themselves at SMMC's Birth Center, and it implemented the medical screening exam and stabilization requirements prescribed by EMTALA.

Under Patient Care Protocol No. 308, registered nurses ("RNs") and certified nurse midwives ("CNMs") constituted "qualified medical personnel" who were authorized to perform medical screening exams on pregnant patients presenting to SMMC's Birth Center to determine if a patient was experiencing an emergency medical condition.  Specifically, Patient Care Protocol No. 308 provided, among other things, that "[a] woman is in true labor unless a physician or qualified medical personnel certifies that, after a reasonable amount of time, the woman is in false labor."  Doc. 142-7 at 4.  Patient Care Protocol No. 308 authorized a woman's

---

[2]     The court refers to plaintiff Teresa Mary Palmer as "Ms. Palmer."  Ms. Palmer's mother also is a named plaintiff in this case, and her name is Teresa Marita Palmer.  The court refers to this plaintiff as "Ms. Palmer's mother."  The court refers to plaintiff James William Palmer as "Ms. Palmer's father." And the court refers to plaintiff Gary D. Grider as "Ms. Palmer's husband."

discharge from SMMC if qualified medical personnel found her "not to be in active labor." *Id.* at 5.

Also, Patient Care Protocol No. 308 provided that "[i]f the hospital applies in a non-discriminatory manner a screening assessment that is reasonably calculated to determine whether an emergency medical condition exists, it has met its obligations under the Emergency Medical Treatment and Active Labor Act (EMTALA)." *Id.* at 4. Patient Care Protocol No. 308 required an assessment of a pregnant woman's physical status based on "vital signs," the "frequency, duration, and intensity of contractions," "fetal monitoring to establish fetal wellbeing," and a "vaginal exam" to "determine fetal presentation and station, cervical dilatation and effacement," and assessment of the "status of membranes." *Id.* at 4–5. It also included a "Plan" providing for consultation with a "physician to determine if [an] emergency medical condition exists and if [the] patient requires admission, discharge, or transfer . . . ." *Id.* at 5. Patient Care Protocol No. 308 did not require a physician to examine a pregnant patient physically and in person when the patient had received prenatal care as part of the medical screening exam and before her discharge from SMMC's Birth Center.

The following nurses provided care to Ms. Palmer after she was admitted to SMMC's Birth Center on November 5, 2014: Katherine Yunghans, CNM; Brandi Leann Fernandez, RN; Lisa Marie Nelson, RN; and Heather Kristine Hardy, RN. Each of these individuals is a "qualified medical personnel" under Patient Care Protocol No. 308. The nurses caring for Ms. Palmer repeatedly took her vital signs, performed a urinalysis, and conducted several vaginal exams (including a speculum exam) to assess her cervix. Ms. Palmer's medical records contain a note reading: "Omit vaginal exam – If less than 37 weeks – or if bleeding – or after membranes rupture." Doc. 142-6 at 28. Also, the nurses administered Fern and Nitrazine tests

to check for the presence of amniotic fluid in the vaginal canal and to determine whether Ms. Palmer's membranes had ruptured. According to Ms. Palmer's medical chart, these tests ultimately produced negative results.[3]

Ms. Palmer's medical chart shows that she had a cervical assessment at 2:55 a.m. The chart describes "OB Vaginal Bleed" as "Pink tinged." Doc. 142-15 at 2. It also states: "10 inch diameter of pinkish fluid present on chux following exam."[4] *Id.* Ms. Palmer had two other cervical assessments at 4:20 a.m. and 6:00 a.m. For these two assessments, Ms. Palmer's medical chart describes "OB Vaginal Bleed" as "Pink tinged." *Id.* Each of the three cervical exams noted on the medical chart list "OB Effacement" as "100." *Id.*

Ms. Palmer's medical chart also includes Progress Notes. One note describes an "Obstetric Exam" and provides "wet pinkish discharge present on glove following exam, perineum appears wet." Doc. 142-6 at 25. The note also reads: "Negative ferning. Negative nitrazine. Amnisura deferred at this time due to presence of blood-tinged muc[ ]us." *Id.* The progress note also describes "contractions" as "mild, Regular, Irritable." *Id.* And it lists "Category I tracing" under "Baby." *Id.*

---

[3]     *See* Doc. 142-6 at 24 (showing negative results for both the Nitrazine and Fern tests). Earlier in her treatment, CNM Katherine Yunghans recorded Ms. Palmer's Fern test as negative and her Nitrazine test as "Indeterminate." Doc. 142-6 at 48. Plaintiffs argue that this earlier recording controverts SMMC's asserted statement of fact that both tests were negative. The court disagrees. Although the records show that an earlier Nitrazine test had produced "Indeterminate" results, this fact does not controvert the fact that the Ms. Palmer's medical chart shows that the Fern and Nitrazine tests *ultimately* produced negative results.

[4]     The parties don't define the word "chux." The court believes this term refers to a disposable underpad used by hospitals to absorb bodily fluid. *See What are Chux Disposable Incontinence Underpads?*, Express Medical Supply Blog (Aug. 9, 2016), https://www.exmed.net/blog/expressmedicalsupply/post/2016/08/09/What-are-Chux-Disposable-Incontinence-Underpads.aspx ("Chux are an older brand of disposable underpads that aren't sold anymore . . . Modern disposable underpads are still called 'chux' . . . much like a tissue is called Kleenex even when it is made by another company.").

Another progress note references a "plan" to "[h]old in L&D triage for evaluation by Dr. Piquard." *Id.* Also, the progress note includes the following notations: "Questionable prolonged ROM [rupture of membranes]" and "Category I FHR tracing." *Id.*

From about 2:41 a.m. until 6:40 a.m., the nurses caring for Ms. Palmer administered electronic fetal heart monitoring. The monitoring found a "stable" and "reassuring fetal heart rate." Doc. 142-6 at 25. Also, the nurses assessed Ms. Palmer's contractions. The nurses documented in Ms. Palmer's medical records that her cervix was dilated to fingertip width and 100% effaced, and that her baby's head was at a -2 station in the birth canal. According to Ms. Palmer's medical chart, over the course of several hours of monitoring, Ms. Palmer's cervix never dilated beyond fingertip width and her baby's head remained at a -2 station.

CNM Katherine Yunghans discussed Ms. Palmer's case with Dr. Michael Magee, and Dr. Magee agreed with CNM Yunghans's plan of care. They both diagnosed Ms. Palmer with false labor. At the same time, CNM Yunghans noted a "[q]uestionable prolonged" rupture of membranes. Doc. 142-6 at 25. Also, she noted that Ms. Palmer's "maternal condition" was "stable." *Id.* Dr. Magee recommended that Dr. Piquard evaluate Ms. Palmer since Dr. Piquard was planning to come to the hospital for another procedure that morning.

According to Ms. Palmer's medical records, she had a pain score of "3" at 3:18 a.m. By 6:00 a.m., Ms. Palmer's pain score had increased to a "5." Around 7:17 a.m., Nurse Brandi Leann Fernandez paged Dr. Piquard. Dr. Piquard returned the page and spoke with Nurse Fernandez. According to Ms. Palmer's medical chart, Dr. Piquard determined that Ms. Palmer was in false labor. So, around 7:29 a.m., Dr. Piquard gave Nurse Fernandez a telephone order to discharge Ms. Palmer from SMMC. At 7:38 a.m., SMMC discharged Ms. Palmer (with discharge instructions) after assessing and monitoring her for more than five hours. Ms. Palmer

used a wheelchair to leave the Birth Center.  SMMC discharged Ms. Palmer to her home, and she

left by private car.

SMMC's discharge instructions included information explaining how to recognize labor.

It provided:

> Yes, Labor Has Probably Started If:
> * Your contractions are getting stronger and more painful instead of weaker.  You'll probably feel them throughout your whole uterus.
> * Your contractions are more regular (you feel them about every 5 to 10 minutes) and they are getting closer together.
> * You have pink-colored or blood-streaked fluid from your vagina.
> * Your water breaks.  It may be a gush or a slow trickle of clear fluid from your vagina.

Doc. 142-6 at 7.  The discharge instructions also describe characteristics of "false labor"

including that "[f]alse labor contractions can be strong, frequent, and painful, but there is no

regular pattern."  *Id.* at 5.

While Ms. Palmer was a patient at SMMC's Birth Center on November 5, 2014, no

nurse, doctor, or other provider asked her for payment or inquired about her ability to pay for the

care she was receiving.  Ms. Palmer testified that the nurses and physicians who assessed her at

SMMC treated her politely, courteously, and nicely on a "mental" level.  Doc. 142-9 at 26

(Teresa Mary Palmer Dep. 100:7–13).  Ms. Palmer also testified that these providers performed

vaginal examinations that caused her pain.  *Id.*  But, Ms. Palmer conceded, she has no evidence

to suggest that the providers at SMMC were trying to cause her pain or mental distress.

Before Ms. Palmer's discharge from SMMC, no nurse, physician, or other healthcare

provider told her that they thought her membranes had ruptured.  Ms. Palmer's chart notes a

"[q]uestionable prolonged" rupture of membranes.  Doc. 142-6 at 25.  But no provider diagnosed

Ms. Palmer with membrane rupture before her discharge.  Also, Ms. Palmer's medical chart does

not show that any SMMC provider actually thought Ms. Palmer was in active or true labor before her discharge.

Ms. Palmer testified that the decisions whether a pregnant woman is in active labor or whether she is in a stable condition are medical decisions that a medical doctor must make. But she believes that SMMC provided her with an inappropriate medical screening exam on November 5, 2014, and that SMMC discharged her in an unstable condition. Specifically, Ms. Palmer testified that she believes her medical screening exam was inappropriate because SMMC's staff: (1) used unreliable Fern and Nitrazine tests to assess her; (2) failed to perform an ultrasound (at her request) to determine fluid levels around her baby; and (3) performed too many vaginal exams with inconclusive results about her cervical dilation. Ms. Palmer also complains that no physician personally examined her to determine her cervical dilation before SMMC discharged her from the hospital.

Ms. Palmer testified that SMMC followed Patient Care Protocol No. 308 when caring for her on November 5, 2014. Also, Ms. Palmer testified that she has no personal knowledge how SMMC screened or treated other women who presented themselves to the Birth Center with concerns about active labor during the time while Patient Care Protocol No. 308 was in effect.

After Ms. Palmer delivered her son at home, she returned to SMMC where Dr. Piquard delivered her placenta without complication. Ms. Palmer concedes that she sustained no physical injuries from giving birth to her son inside her home on November 5, 2014. Also, Ms. Palmer testified that her son is normal and healthy.

Ms. Palmer asserts that SMMC's treatment of her on November 5, 2014, deviated from the standard of care, and thus SMMC acted negligently. Ms. Palmer concedes, however, that she has not sought any medical or psychological treatment as a result of the events of November 5,

2014.  No healthcare provider has diagnosed Ms. Palmer with anxiety or depression because of those events.  Also, no medical records exist showing that Ms. Palmer has anxiety or depression. Ms. Palmer also testified that she has not sought any spiritual meditation or alternative medicine care because of the events of November 5, 2014.

Ms. Palmer has continued to work and earn income since delivering her son on November 5, 2014.  She has taken vacations, and she has continued to contribute to her marriage. Also, Ms. Palmer still can have another child if she wanted to do so.

Like Ms. Palmer, the other three plaintiffs—her husband, mother, and father—testified that their claims in this lawsuit are based on their assertion that SMMC and its staff provided Ms. Palmer treatment below the level required by the standard of care.  Thus, these three plaintiffs contend, SMMC conducted itself negligently because of the way it treated Ms. Palmer and decided to discharge her.  These three plaintiffs were not patients at SMMC on November 5, 2014, and they had no provider-patient relationships themselves with doctors or nurses at the hospital that day.

Like Ms. Palmer, the other three plaintiffs—her husband, mother, and father—never have sought any medical or psychological treatment because of the events of November 5, 2014 (nor have they self-medicated).  Also, no healthcare provider has diagnosed any one of these three plaintiffs with anxiety or depression based on the events of November 5, 2014.  The other three plaintiffs have continued to work since November 5, 2014.

Plaintiffs have not designated any experts to testify in support of their claims in this lawsuit.  None of the plaintiffs are medical doctors or nurses.

### III.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof."  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at

670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

The court applies this same standard to cross motions for summary judgment. Each party

bears the burden of establishing that no genuine issue of material fact exists and that it is entitled,

as a matter of law, to the judgment sought by its motion. *Atl. Richfield Co. v. Farm Credit Bank

of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Cross motions for summary judgment "are to

be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co.,

Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). But where the cross motions overlap, the

court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d

1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.

Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## IV.    Analysis

Because the parties' cross motions for summary judgment overlap, the court addresses

their legal arguments together. Defendants assert that they are entitled summary judgment as a

matter of law against plaintiffs' EMTALA and intentional infliction of emotional distress claims.

Plaintiffs contend that they are entitled to summary judgment in their favor on the same two

claims. The court address each legal claim, below.

### A.  Ms. Palmer's EMTALA Claim

EMTALA is a federal statute that provides for civil penalties against hospitals and

physicians who negligently violate that act. 42 U.S.C. § 1395dd(d)(1). "Congress enacted

EMTALA in 1986 to address the problem of 'dumping' patients in need of medical care but

without health insurance." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001) (first citing *Abercrombie v. Osteopathic Hosp. Founders Ass'n*, 950 F.2d 676, 680 (10th Cir. 1991); then citing *Stevison v. Enid Health Sys.*, 920 F.2d 710, 713 (10th Cir. 1990)).

This statute "places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an 'emergency medical condition.'" *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 250 (1999). EMTALA thus imposes two requirements on participating hospitals. *Phillips*, 244 F.3d at 796. "First, the hospital must conduct an initial medical examination to determine whether the patient is suffering from an emergency medical condition." *Id.*; *see also* 42 U.S.C. § 1395dd(a) ("[T]he hospital must provide for an appropriate medical screening . . . to determine whether or not an emergency medical condition . . . exists."). "The second obligation requires the hospital, if an emergency medical condition exists, to stabilize the patient before transporting him or her elsewhere." *Phillips*, 244 F.3d at 796; *see also* 42 U.S.C. § 1395dd(b) ("If . . . the hospital determines that the individual has an emergency medical condition, the hospital must provide either . . . such further medical examination and such treatment as may be required to stabilize the medical condition, or . . . transfer . . . the individual to another medical facility [after satisfying certain requirements in] subsection (c) of this section."). "To ensure compliance with these obligations, Congress created a private cause of action." *Phillips*, 244 F.3d at 796 (first citing 42 U.S.C. § 1395dd(d); then citing *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 521–22 (10th Cir. 1994)).

The Tenth Circuit has cautioned, however, that EMTALA "is neither a malpractice nor a negligence statute." *Repp*, 43 F.3d at 522 (citation and internal quotation marks omitted). When Congress enacted EMTALA, it never "intended 'to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly

provided to patients in similar medical circumstances.'" *Id.* (quoting *Collins v. DePaul Hosp.*, 963 F.2d 303, 307 (10th Cir. 1992)).  So, to prevail, an EMTALA plaintiff must establish that the treating hospital treated him or her differently than it would have treated other patients in like circumstances.  *Id.* ("A hospital satisfies the requirements of § 1395dd(a) if its standard screening procedure is applied uniformly to all patients in similar medical circumstances." (citation and internal quotation marks omitted)); *see also id.* ("[A] hospital violates [EMTALA] when it does not follow its own standard procedures."); *see also Phillips*, 244 F.3d at 796–97 ("A court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed." (citation and internal quotation marks omitted)).

But still, "this standard does not mean that any slight deviation by a hospital from its standard screening policy violates EMTALA."  *Repp*, 43 F.3d at 523.  "Mere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy."  *Id.*  Because, "[t]o hold otherwise would impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed."  *Id.*

Here, Ms. Palmer asserts that SMMC violated EMTALA by:  (1) failing to provide her an appropriate medical screening exam; (2) discharging a pregnant patient experiencing cramps in true labor; and (3) failing its duty to stabilize within its capabilities.  Doc. 129 at 6–7 (Pretrial Order ¶ 4.a.1.); Doc. 145 at 12–13 (Pls.' Mot. Summ. J.).  SMMC responds, arguing that Ms. Palmer's allegations merely complain that SMMC acted negligently.  But, SMMC contends, the summary judgment facts do not present a triable issue whether SMMC violated EMTALA. SMMC asserts four arguments supporting summary judgment against Ms. Palmer's EMTALA claim.

*First*, SMMC contends, the summary judgment record presents no genuine issue whether SMMC failed to follow its own procedures. To the contrary, SMMC contends, the summary judgment facts establish that SMMC adhered to the requirements of Patient Care Protocol No. 308. Indeed, the summary judgment record—viewed in Ms. Palmer's favor—establishes that: (1) "qualified medical personnel"—as Patient Care Protocol No. 308 defined the term—provided care to Ms. Palmer when she presented to SMMC's Birth Center on November 5, 2014; (2) SMMC's staff repeatedly took Ms. Palmer's vital signs, performed a urinalysis, conducted several vaginal exams (including a speculum exam) to assess her cervix, and administered Fern and Nitrazine tests to check for the presence of amniotic fluid in the vaginal canal and to determine whether Ms. Palmer's membranes had ruptured; and (3) two physicians—Dr. Magee and Dr. Piquard—diagnosed Ms. Palmer with false labor. Also, as Ms. Palmer conceded in her deposition testimony, SMMC followed Patient Care Protocol No. 308 when caring for her on November 5, 2014.

But, on the summary judgment motions, Ms. Palmer argues that SMMC failed to follow its Patient Care Protocol No. 308 because SMMC's staff never determined her cervical dilation or whether her membranes had ruptured. Doc. 145 at 13. The summary judgment record—even when viewed in Ms. Palmer's favor—can't support either of these allegations. Ms. Palmer's medical chart shows that nurses documented that her cervix was dilated to fingertip width and 100% effaced, and that her baby's head was at a -2 station in the birth canal. And, over the course of several hours of monitoring, Ms. Palmer's cervix never dilated beyond fingertip width and her baby's head remained at a -2 station. Thus, according to Ms. Palmer's medical records, SMMC determined Ms. Palmer's cervical dilation.[5]

---

[5] Ms. Palmer argues that her cervical examinations produced conflicting results. But the admissible summary judgment evidence won't support this allegation either.

Ms. Palmer's medical chart also shows that nurses administered Fern and Nitrazine tests to check for the presence of amniotic fluid in the vaginal canal and to determine whether Ms. Palmer's membranes had ruptured. According to Ms. Palmer's medical records, these tests ultimately produced negative results. Ms. Palmer argues that these tests are unreliable. But that argument merely complains that SMMC failed to reach a correct diagnosis. It does not establish an EMTALA violation. *See Repp*, 43 F.3d at 522 (explaining that EMTALA is "not intended to ensure each emergency room patient [receives] a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances." (citation and internal quotation marks omitted)).

Also, Ms. Palmer argues, CNM Yunghans noted a "[q]uestionable prolonged" rupture of membranes on her medical chart. Ms. Palmer argues that this note establishes that SMMC never determined the status of her membranes. Even so, Ms. Palmer never identifies where Patient Care Protocol No. 308 required SMMC to determine the status of a patient's membranes. Instead, the policy simply requires an assessment of the "status of membranes" using a vaginal exam. Doc. 142-7 at 5. The summary judgment record establishes that SMMC complied with this requirement. And no SMMC provider ever diagnosed Ms. Palmer with membrane rupture. Again, Ms. Palmer merely is complaining that SMMC's assessment of her membranes produced an incorrect diagnosis. But an incorrect diagnosis will not establish an EMTALA violation.

The court also recognizes that Ms. Palmer asserts in the Pretrial Order that SMMC violated Patient Care Protocol No. 308 by "performing vaginal exams without a physician order on a patient less than 37 weeks, and bright red bleeding . . . ." Doc. 129 at 3 (Pretrial Order 3.a.). Patient Care Protocol No. 308 provides:

> physician order needed to perform digital exam for:

a) gestation less than 37 weeks with or without suspected spontaneous rupture of membranes
b) bright red bleeding
c) diagnosis of placenta previa
d) when Fetal Fibronectin is ordered in pre-term labor

Doc. 142-7 at 5.  The summary judgment facts, viewed in Ms. Palmer's favor, establish she was 36.2 weeks pregnant when she presented at SMMC's Birth Center.  But the summary judgment record contains no facts showing that Ms. Palmer was experiencing "bright red bleeding" as Patient Care Protocol No. 308 provides.  The court recognizes that Ms. Palmer's medical chart twice documents an "OB Vaginal Bleed" as "Pink tinged."  It also references the presence of pinkish fluid after staff performed vaginal exams.  But her medical records never describe "bright red bleeding."  And plaintiff provides no other admissible summary judgment evidence to support her assertion that she experienced bright red bleeding when she presented herself to SMMC.

And, even if SMMC had violated this portion of Patient Care Protocol No. 308 by performing a digital exam on Ms. Palmer without a physician's order, Ms. Palmer fails to show how this deviation from hospital policy was more than a *de minimus* one.  As the Tenth Circuit has explained, "[m]ere *de minimus* variations from the hospital's standard procedures do not amount to a violation of hospital policy."  *Repp*, 43 F.3d at 523.  And so, EMTALA does not "impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed."  *Id.*  Here, the summary judgment facts, viewed in Ms. Palmer's favor, present no triable issue whether SMMC effectively followed its policies.  SMMC provided an appropriate medical screening—consistent with Patient Care Protocol—to determine whether Ms. Palmer was experiencing a medical emergency.[6]  Ms. Palmer readily disagrees that SMMC

---

[6]     Plaintiffs' Response in Opposition to SMMC's Motion for Summary Judgment argues that Ms. Palmer has claimed more than mere *de minimus* variations of hospital policy.  Doc. 149 at 14.  And citing

provided an adequate medical screening. But her complaints assert that SMMC was negligent when it performed that screening and produced an incorrect diagnosis. As already discussed, such complaints cannot support an EMTALA violation.

*Second*, SMMC argues, Ms. Palmer cannot bring an EMTALA claim based on SMMC's alleged negligence because EMTALA is not a medical malpractice statute. The court agrees. The Tenth Circuit has made it clear that EMTALA "is neither a malpractice nor a negligence statute." *Repp*, 43 F.3d at 522 (citation and internal quotations marks omitted); *see also Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 798 (10th Cir. 2001) ("EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws."). EMTALA "does not provide a remedy for an inadequate or inaccurate diagnosis." *Phillips*, 244 F.3d at 798 (citations omitted); *see also id.* at 798–99 (holding that, although plaintiffs argued that hospital staff "failed to appropriately identify and/or appreciate the gravity of [plaintiff's] condition," the record established that the hospital "technically complied with their pre-existing standards," and so "the practical effect was an inadequate examination" and "the district court was, as a matter of law, correct in stating no evidence of an EMTALA claim was presented").

Like the plaintiffs in *Phillips*, Ms. Palmer complains here about SMMC's diagnosis. She argues that SMMC staff acted negligently when they purportedly provided her an inadequate

_____

the court's ruling on defendants' Motions to Dismiss, Ms. Palmer contends that the court already has "dismissed" SMMC's argument that she merely asserts *de minimus* violations of hospital policy. *Id.* Ms. Palmer's argument confuses the procedural posture of the court's earlier ruling and the parties' arguments on summary judgment.

At the pleading stage, the court held that the Complaint's allegations "as pleaded—assert[ed] more than *de minimus* violations of hospital policy" and thus "plaintiff Teresa Mary Palmer [had] asserted facts sufficient to state a plausible claim against SMMC under EMTALA." Doc. 84 at 12. But, on summary judgment, Ms. Palmer—as the non-moving party on SMMC's summary judgment motion— "may not rest on [her] pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which [she] carries the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). For reasons explained, Ms. Palmer fails to carry that summary judgment burden here.

medical screening that failed to diagnose that she was experiencing active labor. And, she contends—albeit without any evidentiary support or expert opinion—that she was in active labor when SMMC discharged her from its Birth Center. Thus, Ms. Palmer argues, SMMC violated EMTALA because it discharged her when she was in an unstable condition. But again, Ms. Palmer's complaints amount simply to allegations of inaccurate and inadequate diagnosis. And, the Tenth Circuit has emphasized that such allegations will not support an EMTALA violation. *See, e.g.*, *Phillips*, 244 F.3d 798; *Repp*, 43 F.3d at 522.

*Third*, SMMC contends, Ms. Palmer has adduced no facts showing that any of SMMC's staff actually knew that her membranes had ruptured, or that she was in active labor when she presented at the hospital on November 5, 2014. EMTALA requires a plaintiff to "prove the hospital had actual knowledge of the individual's unstabilized emergency medical condition to succeed with a claim" under the statute. *Urban ex rel. Urban v. King*, 43 F.3d 523, 526 (10th Cir. 1994). Here, Ms. Palmer cites several reasons that show—she claims—SMMC's providers knew that Ms. Palmer was in active labor. Doc. 149 at 15. They include her symptoms of cramping, leaking fluid, and vaginal bleeding. *Id.* Although the summary judgment record establishes that Ms. Palmer had these symptoms, no summary judgment facts establish that SMMC providers *actually knew* that she was in active labor because she was exhibiting these symptoms. To the contrary, viewing the summary judgment facts in Ms. Palmer's favor, her medical chart establishes that SMMC providers concluded that she was in false labor based on other symptoms she was exhibiting. Thus, no reasonable jury could conclude from the summary judgment facts that SMMC actually knew that Ms. Palmer was in active labor and in an unstabilized emergency condition when SMMC discharged her from the Birth Center on November 5, 2014.

*Finally*, SMMC argues, the summary judgment facts present no genuine issue of an EMTALA violation because Ms. Palmer concedes that no one at SMMC asked about her ability to pay for the care that she was receiving during the more than five hours that SMMC staff assessed and monitored her at the Birth Center. As explained, Congress's purpose when enacting EMTALA was "to address the problem of 'dumping' patients in need of medical care but without health insurance." *Phillips*, 244 F.3d at 796. Here, the summary judgment record contains no facts creating a genuine issue whether SMMC was trying to avoid giving care to Ms. Palmer because it was concerned about her ability to pay. To the contrary, the summary judgment facts establish that no one ever asked Ms. Palmer about her ability to pay for care.

For all these reasons, the summary judgment facts viewed in Ms. Palmer's favor present no triable issue of an EMTALA violation. The court thus grants SMMC's Motion for Summary Judgment against Ms. Palmer's EMTALA claim. Also, the court denies plaintiffs' Motion for Summary Judgment on Ms. Palmer's EMTALA claim. The summary judgment facts—when viewed in SMMC's favor—fail to establish that SMMC violated EMTALA as a matter of law.

### B. Plaintiffs' Intentional Infliction of Emotional Distress Claim

All four plaintiffs assert a Kansas state law claim for intentional infliction of emotional distress. Before addressing the only remaining claim in this case, the court considers whether it should exercise supplemental jurisdiction over it. The parties invoke the court's federal question jurisdiction. *See* Doc. 129 at 2 (Pretrial Order ¶ 1.a.) (reciting that subject matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed). But, because the court has concluded that defendant SMMC deserves summary judgment against Ms. Palmer's EMTALA claim—the only federal claim asserted in this lawsuit—the court may decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claim. 28 U.S.C. § 1367(c)(3) ("The district

courts may decline to exercise supplemental jurisdiction [when] the district court has dismissed all claims over which it has original jurisdiction.").

The decision in this circumstance whether to exercise supplemental jurisdiction is committed to the district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004). Indeed, the Tenth Circuit has expressed a general preference that a district court decline jurisdiction over state law claims if it dismisses all federal claims. *See Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). The Supreme Court has sharpened the analysis. Its rulings direct district courts, when deciding whether to maintain supplemental jurisdiction over state law claims, to consider "the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).

Here, the court concludes that the governing factors favor the court exercising its supplemental jurisdiction over plaintiffs' remaining state law claim. The pretrial proceedings mostly are complete. Discovery is closed, and the parties have filed summary judgment motions. Judicial economy favors the court deciding the state law claim now on the complete summary judgment record that the parties have worked carefully to assemble and submit. Also, convenience favors the court exercising its supplemental jurisdiction because—again, the court can decide this claim now—without requiring plaintiffs to pay to refile their state law claim in

state court.  Also, this result is not unfair.  Plaintiffs chose this forum by filing their federal and state claims here in federal court.  *See* Doc. 1 (Complaint).  Applying its discretion, the court thus decides to exercise supplemental jurisdiction over plaintiffs' remaining state law claim.

As the court previously has recognized, "Kansas has set a very high standard for the common law tort of intentional infliction of emotional distress or, as it is sometimes referred to, the tort of outrage."  *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1304 (D. Kan. 2009) (citation and internal quotation marks omitted); *see also McCall v. Bd. of Comm'rs of Cty. of Shawnee*, 291 F. Supp. 2d 1216, 1229 (D. Kan. 2003) ("Claims of outrage in Kansas are reserved for the most egregious circumstances.").  Indeed, "[t]he overwhelming majority of Kansas cases have held in favor of defendants on the outrage issue, finding that the alleged conduct was insufficiently 'outrageous' to support the cause of action."  *Lindemuth v. Goodyear Tire & Rubber Co.*, 864 P.2d 744, 749 (Kan. Ct. App. 1993).

In Kansas, intentional infliction of emotional distress requires the following four elements:

> (1) The conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe.

*Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010) (citing *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991)).

Defendants assert that the summary judgment evidence—even when viewed in plaintiffs' favor—presents no triable issue on either the second or fourth elements because no reasonable jury could conclude either that:  (1) defendants' conduct was extreme and outrageous, or (2) plaintiffs sustained extreme and severe mental distress.  Also, defendant Mid America Physician

Services, LLC ("MAPS") asserts that the summary judgment facts present no genuine issue whether MAPS participated in any conduct that plaintiffs complain occurred on November 5, 2014. And, MAPS contends, Kansas law imposes no vicarious liability on MAPS for the actions or inactions of another Kansas healthcare provider. First, the court addresses MAPS's liability arguments. Next, it considers the second and fourth elements of plaintiffs' intentional infliction of emotional distress claim.

### 1. MAPS's Liability Arguments

Defendant MAPS asserts that the summary judgment record contains no facts showing that it committed any acts that could support the intentional infliction of emotional distress claim plaintiffs assert against this defendant. The court agrees. In her testimony, Ms. Palmer explained that she has sued MAPS because Dr. Piquard is a member of its healthcare practice group. *See* Doc. 135-7 at 29 (Teresa Mary Palmer Dep. 109:12–15). Similarly, Ms. Palmer's mother and father testified that they have sued MAPS because Dr. Piquard and Dr. Magee have a professional affiliation with MAPS. Doc. 135-9 at 15–16 (Teresa Marita Palmer Dep. 55:22–56:4, 57:4–9); Doc. 135-10 at 19 (James William Palmer Dep. 70:13–23). And Ms. Palmer's husband testified that he bases his intentional infliction of emotional distress claim on the misdiagnosis of false labor by the medical providers who treated Ms. Palmer. Doc. 135-8 at 14 (Gary Dean Grider Dep. 49:9–20, 50:6–12).

But, in Kansas, "[a] health care provider . . . shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider . . . ." Kan. Stat. Ann. § 40-3403(h);[7] *see also Cady v. Schroll*, 317 P.3d 90, 100 (Kan. 2014) ("[W]e

---

[7] The undisputed summary judgment facts establish that MAPS, Dr. Piquard, and Dr. Magee met the requirements for coverage under the health care stabilization fund as of November 5, 2014, and as

reaffirm the holding in those cases that [Kan. Stat. Ann. §] 40-3403(h) absolves a health care provider not just from vicarious liability but from any responsibility, including independent liability, where the injured party's damages are derivative of and dependent upon the rendering of or the failure to render professional services by another health care provider."); *Luttrell v. Brannon*, No. 17-2137-JWL, 2018 WL 3032993, at *10–11 (D. Kan. June 19, 2018) (holding that Kan. Stat. Ann. § 40-3403(h) immunizes healthcare providers from liability for plaintiff's state law claims that "arise out of another health care provider's rendering of or failure to render professional services").

Here, plaintiffs' Response in Opposition to defendant MAPS's summary judgment motion confirms that plaintiffs base their intentional infliction of emotional distress claim on the treatment—or lack of treatment—that Dr. Piquard and Dr. Magee provided to Ms. Palmer. *See* Doc. 140 at 10–11 (alleging that Ms. Palmer "was never seen by a physician, yet two different MAPS physicians directed the entire healthcare [Ms. Palmer] received" and that "this amounts to outrageous conduct"). Under Kansas law, MAPS is not vicariously liable for acts by these physicians. The court thus grants summary judgment against the intentional infliction of emotional distress claim asserted against defendant MAPS. But, even if Kansas law permitted plaintiffs to establish that MAPS is liable for Dr. Piquard and Dr. Magee's conduct, the court still would grant summary judgment against plaintiffs' intentional infliction claim because the summary judgment facts—when viewed in plaintiffs' favor—present no triable issue on at least two of the essential elements of the claim. The court explains why in the following two subsections.

---

defined by Kan. Stat. Ann. §§ 40-3401, *et seq.* Doc. 135-6 at 1–2 (Rita Noll Aff. ¶¶ 3–5). Thus, § 40-3403(h) applies to shield MAPS from vicarious liability in this lawsuit.

## 2. Extreme and Outrageous Conduct

The court grants summary judgment against plaintiffs' intentional infliction of emotional distress claim asserted against both defendants SMMC and MAPS because the summary judgment facts—viewed in plaintiffs' favor—present no triable issue whether defendants engaged in extreme and outrageous conduct. Because no reasonable jury could conclude that defendants' conduct was extreme and outrageous in the sense required by Kansas law, plaintiffs cannot establish the second element of an intentional infliction of emotional distress claim. And thus, plaintiffs' claim fails as a matter of law.

The Kansas Supreme Court has defined the type of extreme and outrageous conduct necessary to support an intentional infliction of emotional distress claim. The purportedly actionable conduct "must transcend a certain amount of criticism, rough language, and occasional acts and words that are inconsiderate and unkind." *Valadez*, 229 P.3d at 394. "The law will not intervene where someone's feelings merely are hurt." *Id.* Instead, the claim requires conduct "outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Id.* (citing *Taiwo*, 822 P.2d at 1029–30).

Here, no reasonable jury could conclude from the summary judgment facts that defendants' conduct was extreme and outrageous. Plaintiffs assert that "[d]ischarging a high-risk patient experiencing preterm labor . . . and three complications" constitutes an extreme and outrageous act sufficient to support an intentional infliction of emotional distress claim under Kansas law. Doc. 149 at 17; *see also* Doc. 145 at 18 (asserting that "discharging a high-risk patient in preterm labor with three complicating factors that amounts to outrageous conduct and should not happen"). But the summary judgment facts don't support this assertion. As discussed already, nothing in the summary judgment record establishes that Ms. Palmer was in "preterm

labor" when SMMC discharged her from its Birth Center.  Plaintiffs point to various symptoms that Ms. Palmer was experiencing and argue that she was in active labor, but no medical provider ever concluded that she was in active labor while she was at SMMC.  Also, plaintiffs have identified no experts who will testify that Ms. Palmer was experiencing active labor when SMMC discharged her from the Birth Center.  Thus, without expert testimony, plaintiffs cannot establish that any medical provider was negligent in his or her treatment of Ms. Palmer.  *See, e.g.*, *Dawson v. Prager*, 76 P.3d 1036, 1038 (Kan. 2003) (explaining that, in Kansas, "expert testimony is necessary to prove a deviation from the standard of care by a health care provider where normal experience and qualifications of laypersons serving as jurors would not permit them to draw proper conclusions").

Viewing the summary judgment facts in plaintiffs' favor, they establish that SMMC staff diagnosed Ms. Palmer as having false labor and discharged her from the hospital.  Less than two hours later, Ms. Palmer delivered her baby at home.  Although plaintiffs assert that defendants' conduct was extreme and outrageous, this assertion does not meet the standard established by the Kansas Supreme Court.  Repeatedly, that court has affirmed judgment against outrage claims in cases involving significantly more compelling facts than the ones presented.  The Kansas Supreme Court concluded that such conduct simply was not extreme and outrageous as matter of law.  *See, e.g.*, *Burgess v. Perdue*, 721 P.2d 239, 243 (Kan. 1986) (affirming summary judgment against an outrage claim brought by a mother who was told that her son's brain was in a jar); *Hoard v. Shawnee Mission Med. Ctr.*, 662 P.2d 1214, 1225–26 (Kan. 1983) (holding that a defendant hospital's conduct was not extreme and outrageous when it erroneously informed plaintiffs that their daughter was dead); *Roberts v. Saylor*, 637 P.2d 1175, 1180–81 (Kan. 1981) (affirming summary judgment against an outrage claim brought by a patient against a doctor who

approached the patient, as she was on a gurney at the hospital preparing for surgery, and told her that he did not like her).

The summary judgment facts here—when viewed in plaintiffs' favor—simply provide no basis for a reasonable jury to find the kind of extreme and outrageous conduct necessary to support a claim for an intentional infliction under Kansas law. The court thus grants defendants' Motion for Summary Judgment against plaintiffs' intentional infliction of emotional distress claim for this reason. Also, the court denies plaintiffs' summary judgment motion seeking judgment in their favor on their intentional infliction of emotional distress claim. The summary judgment facts—viewed in defendants' favor—fail to establish that defendants' conduct was extreme and outrageous as a matter of law.

### 3. Extreme and Severe Mental Distress

The court also grants summary judgment against plaintiffs' intentional infliction of emotional distress claim for another, independent reason. Plaintiffs have failed to adduce any evidence that would permit a reasonable jury to find that any of the four plaintiffs sustained extreme and severe mental distress. This element of an intentional infliction claim requires emotional distress that "is sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it." *Roberts*, 637 P.2d at 1179. Although "[e]motional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry[,] . . . it is only when emotional distress is extreme that possible liability arises." *Id.* at 1180. "The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results

from a peculiar susceptibility to such distress of which the actor had knowledge." *Id.* (citations omitted). "The emotional distress must in fact exist, and it must be severe." *Id.* (citation omitted).

Here, the summary judgment record contains no evidence presenting a triable issue whether any of the four plaintiffs have sustained extreme and severe mental distress. Ms. Palmer concedes that she sustained no physical injuries whatsoever from giving birth to her son at home on November 5, 2014. Also, Ms. Palmer testified that her son is normal and healthy. Ms. Palmer has not sought any medical or psychological treatment as a result of the events of November 5, 2014. No healthcare provider has diagnosed Ms. Palmer with anxiety or depression because of the events of November 5, 2014. Also, Ms. Palmer has no medical records showing that she has anxiety or depression. Ms. Palmer testified that she has not sought any spiritual meditation or alternative medicine care because of the events of November 5, 2014. She has continued to work and earn income since giving birth. She has taken vacations, and she has continued to contribute to her marriage. These facts will not permit a reasonable jury to conclude that Ms. Palmer has sustained extreme and severe mental distress necessary to support an intentional infliction of emotional distress claim. *See, e.g.*, *Valadez*, 229 P.3d at 395 (holding no extreme and severe mental distress existed, although plaintiff felt physically ill, afraid, and cried, because the record showed no long-lasting effects or medical treatment or psychological counseling resulting from defendants' alleged outrageous conduct); *Roberts*, 637 P.2d at 1181 (affirming summary judgment and concluding no extreme and severe distress when plaintiff expressed fright, embarrassment, and worry because "[t]he emotional distress suffered by her was resentment and upset which normally results from acts and criticism which are inconsiderate and unkind" but does not constitute an actionable outrage claim); *Dana v. Heartland Mgmt. Co.*,

301 P.3d 772, 781 (Kan. Ct. App. 2013) (affirming summary judgment and holding that plaintiff's allegations of chest pain, discomfort, crying, and increased heart and sleep medications did not rise to the level of extreme or severe distress).

The other three plaintiffs—Ms. Palmer's husband, mother, and father—were not patients of SMMC on November 5, 2014. Thus, they base their intentional infliction of emotional distress claim on Ms. Palmer's treatment at SMMC's Birth Center. Like Ms. Palmer, these three plaintiffs never have sought any medical or psychological treatment because of the events of November 5, 2014. They also have not tried any self-medication. No healthcare provider has diagnosed any of the three plaintiffs with anxiety or depression based on the events of November 5, 2014. And these three plaintiffs have continued to work since November 5, 2014. The undisputed facts—even when viewed in plaintiffs' favor—present no triable issue whether these three plaintiffs sustained extreme and severe emotional distress because of the events of November 5, 2014.

In sum, no reasonable jury could find that any of the four plaintiffs have sustained extreme and severe mental distress sufficient to support an outrage claim under Kansas law. Indeed, plaintiffs have identified no evidence in the summary judgment record presenting a triable issue whether any of the four of them have sustained *any* emotional distress from the events of November 5, 2014—much less distress that a jury could conclude amounts to extreme and severe emotional distress. And, on summary judgment, plaintiffs as the non-moving party "must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which [they] carr[y] the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). Plaintiffs here

have failed to carry this burden.  The court thus grants summary judgment against plaintiffs' intentional infliction of emotional distress claim for this second, independent reason.

Finally, the court denies plaintiffs' summary judgment motion seeking judgment in their favor on their intentional infliction of emotional distress claim.  The undisputed summary judgment facts—when viewed in defendants' favor—fail to establish as a matter of law that any plaintiff sustained extreme and severe mental distress.

## V.      Plaintiffs' Motion in Limine (Doc. 119)

Plaintiffs also have filed a Motion in Limine and Request for Order Limiting Angela Piquard, M.D.'s Testimony to Personal Knowledge Only.  Doc. 119.  With their motion, plaintiffs ask the court to strike Dr. Piquard's expert report because, they contend, it contains misleading statements and omits material facts.  *Id.* at 4.  Defendants construe plaintiffs' motion as a *Daubert* challenge under Fed. R. Evid. 702 and 703 to defendants' designated expert witness.  Doc. 126 at 1.  And, defendants argue, plaintiffs' *Daubert* challenge fails because the materials they cite to support their motion lack any foundation and thus constitute hearsay.  *Id.* at 2.  Thus, defendants ask the court to deny plaintiffs' Motion in Limine.

The court has reached its decisions on the parties' cross motions for summary judgment without considering Dr. Piquard's expert opinions or her report.  And, because the court has granted summary judgment for defendants and thus dismissed plaintiffs' claims, the court need not decide whether Dr. Piquard's expert report is admissible evidence.  The court thus denies as moot plaintiffs' Motion in Limine.

**VI.     Conclusion**

For the reasons explained above, the court grants defendants' summary judgment motions.  And the court denies plaintiffs' summary judgment motion.  Also, the court denies plaintiffs' Motion in Limine as moot.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion in Limine (Doc. 119) is denied as moot.

**IT IS FURTHER ORDERED THAT** defendant Mid America Physician Services, LLC's Motion for Summary Judgment (Doc. 133) is granted.

**IT IS FURTHER ORDERED THAT** defendant Shawnee Mission Medical Center, Inc.'s Motion for Summary Judgment (Doc. 141) is granted.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Summary Judgment (Doc. 145) is denied.

**IT IS SO ORDERED.**

**Dated this 8th day of November, 2018, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**